: James-Brent: Alvarez.
: For the appearance is Pro Per; Sui Juris.



: C.-S.-S.-C.-P.-S.-G.-P. FLAG OF THIS DOCUMENT-POSTAL-VESSEL-COURT-VENUE.

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

: James-Brent: Alvarez.
              an individual,

    v.

Luke Sitts, an individual;
Geri Brooks, an individual;
Scott Geeting, an individual;
Steven Barrett, and individual;
Don Morris, an individual;
Matthew Carmichael, an individual;
Michael H. Schill, an individual,

        Defendants.

Case No.: 6:19-cv-01071-AA

PLAINTIFFS' OBJECTIONS TO THE
COURT'S OPINION AND ORDER'S
AND MOTION FOR LEAVE TO AMEND
THE COMPLAINT A THIRD TIME

**: WITH THE COMMON-LANGUAGUE OF THE USA FOR THE ASSISTANCE.**

## LR 7-1 CERTIFICATION

Plaintiff certifies that he has attempted to have conference with counsel for defendants—Luke Sitts, Geri Brooks, Scott Geeting, Steven Barrett, Don Morris, Matthew Carmichael, and Michael H. Schill, by calling and leaving a voicemail on October 5, 2020, by voicemail and email on October 6, 2020, and a voicemail on October, 13, 2020, in regards to the matters scribed herein, and council for defendants have not provided a response stating whether they are opposed or unopposed.

## MOTION

In accordance with Fed. R. of Civ. P. 46, and without waiver of any rights, the plaintiff, respectfully, moves the Court for an order granting leave to write a third amended complaint for excessive force and a deprivation of constitutional rights under 42 USC § 1983 pursuant to the following objections:

- First, there is a communication barrier between the plaintiff, the attorneys for the defendants, and the Court.

- Second, the Courts' Second Opinion and Order is prejudicial towards the plaintiff because the Court presumed jurisdiction for the defendants that the defendants do not have and cannot prove.

- Third, there is a three-strike rule that runs deep in our Nation's History that should be applied in this matter.

## MEMORANDUM IN SUPPORT

### I.      BACKGROUND

On August 25, 2020, the Court issued a second Opinion and Order granting defendants' motion to dismiss plaintiffs' second amended complaint and denying plaintiff's motion to file a third amendment complaint. (ECF No. 64.)  The second Opinion and Order of the Court contradicts the first Opinion and Order of the Court, set forth on January 6, 2020, because the Court presumed jurisdiction.

Consequently, the Court left the plaintiff with an excessive-force case against four (4) defendants – Luke Sitts, Scott Getting, Geri Brooks, and Steven Barrett.  Further, the Court dismissed the plaintiff's 42 USC § 1983 claims against all defendants – Luke Sitts, Scott Getting, Geri Brooks, Steven Barrett, Don Morris, Matthew Carmichael, and Michael Schill.

Moreover, the Court dismissed the plaintiffs' 42 USC § 1985 and 42 USC § 1986 claims against all defendants—Luke Sitts, Scott Getting, Geri Brooks, Steven Barrett, Don Morris, Matthew Carmichael, and Michael Schill—and defendants Don Morris, Matthew Carmichael, and Michael Schill are dismissed from the civil action.

## II.    DISCUSSION

### A.    Communication barrier

The plaintiff believes, *respectfully*, that the Court made an error with its' Opinion and Order on August 25, 2020, by granting defendants' motion for dismissal and denying plaintiff's motion for leave to amend his complaint a third time.  Specifically, the plaintiff believes the Court made an error in dismissing plaintiff's civil action for a deprivation of constitutional rights under 42 USC § 1983 and dismissing defendants Don Morris, Matthew Carmichael, and Michael Schill from the civil action.

Moreover, the plaintiff believes, once again, with the upmost respect, that the Court erred with its' Opinion and Order on January 6, 2020, by dismissing the defendants University of Oregon and the University of Oregon's Police Department ("UOPD" in citations) from the civil action.

First, as best spoken by Paul Newman in (*Cool Hand Luke* 1967) ("What we've got here is a failure to communicate").  It has been made abundantly clear by the attorneys for the defense, further, by the Court, that they have had a very difficult time understanding the allegations in the plaintiff's first-two complaints, as evidenced by the following:

> "Defendants addressed the arguments they could understand given that the second amended complaint is written in a combination of what plaintiff calls 'plain language' and 'CORRECT-SENTENCE-STRUCTURE-COMMUNICATIONS-PARSE-SYNTAX-GRAMMER,' OR 'C.-S.-S.-C.-P.-S.-G.-P.' FOR SHORT."  (Defendants' Response to Plaintiff's Objection and Motion for Performance of Contract [ECF no. 58] and Plaintiff's Affidavit and Attached Evidence [ECF no. 60] at 3).

> "Both employ unusual syntax and use of punctuation, which makes the complaint difficult to comprehend."  (The Courts' First Opinion and Order at 2).

Moreover, the plaintiff does not understand the terms of the words the attorney's or the Court are using in their written communication as evidenced by the following:

> "Also, I do not know what styles manual or dictionary is being used for the pleadings, but am trying to adapt, so that the pleadings are understandable."  (Plaintiffs' Motion for Third Leave to Amend the Complaint under the Note at 7).

Furthermore, there are several instances where the attorneys and the Court misrepresent the plaintiff's sentences and the definitions of the words he uses in his pleadings, as evidenced by the following:

> "Defendant's pleadings continue to avoid a responsive reply, and look to create confusion by… and (4) alleging additional facts—claiming a routine traffic stop—in an attempt to lay the foundation for the complaint."  (Plaintiff's Objection and Motion for Performance of Contract at 1).

"Second, defendants continue to twist the facts of plaintiff's pleadings."
(Plaintiff's Reply to Defendant's Response [ECF No. 61] to Plaintiffs' Objection and
Motion for Performance of Contract and Affidavit [ECF No. 60] at 4).

"Defendant's use of the word "driving" in place of the word "traveling" changes
the facts of plaintiff's complaint, and in this way, defendant's introduce new facts into the
record that are not plead in the plaintiff's pleadings.  In sum, defendants continue to
mislead the Court with false statements, by claiming plaintiff was involved in a routine
traffic stop."  Id at 5.

"Defendants, with their Motion to Dismiss (ECF No. 41) claim to rely on the
allegations as stated within the Second Amended Complaint. However, this is not the
case. One of many examples can be found at the bottom of pg. 4 and the top of pg. 5 of
the defendant's Motion to Dismiss, "Plaintiff resisted arrest, which resulted in Officer
Brooks' deploying a conductive electric device ("CED") [sic]."  Allegations @ 49-54 of
the "SAC" (ECF No. 38) as stated makes no mention of the word "CED" it specifically
makes use of the word taser, Moreover, the claims in the complaint @ (SAC 49-54) (nor
anywhere else in the complaint) never allege that the plaintiff resisted arrest.  A false
statement designed to mislead the Court, and one of many in attempt to deceive and
lessen the impact of the defendant's acts.  (Amended Plaintiff's Response in Opposition
of Defendant's Motion to Dismiss the Second Amended Complaint cliff-note 4 at 2).

It should be apparently evident to the Court that at this point in time, that there is a
communication barrier between the parties and the Court.  In further illustration to the Court, plaintiff has
no idea what the terms for the Courts' words mean:

"Motion is taken under *advisement* as of 10/21/2019."  (ECF No. 24 Order at 1)
(emphasis mine).

"The Court will not *treat* his motion for leave to amend as his response." (ECF
No. 46 Order at 1) (emphasis mine).

The plaintiff does not know what the terms are for the Court's words, as they were not
provided, and therefore, is left to draw his own conclusions.  Does advisement mean consideration?  What
does the Court mean it will not treat the plaintiff's motion?  Does these mean to not consider?  This is
why the plaintiff has used the common-language of the USA and referenced what dictionary he is using to
define the terms of his words.  Without reference by the attorneys or the Court as to what dictionary they
are using for the terms of their words, the plaintiff is handicapped by this disability.

Thereby, pursuant to 42 U.S.C. § 12101 "Americans with Disabilities Act", the
communication barrier that has been an issue while litigating this matter before the Court should be
reason in itself to allow the plaintiff to write a third amended complaint.  As it would be prejudicial of the
Court to conclude that the plaintiff was not deprived of his constitutional rights against the defendants in
this action, because the attorneys and Court do not understand the communication by the plaintiff.

**B.      Prejudicial Conclusion**

The Court's Second Opinion and Order is prejudicial against the plaintiff, because it presumes certain facts, and thereby, it presumes jurisdiction for the defendants.  Specifically, the Court assumes jurisdiction for the defendants under color of a "traffic stop" pursuant to "Oregon Vehicle Code" under Title 59 chapters 801 et seq., by the Court alleging the ("plaintiff admits that he was driving without a license plate and a driver's license, and those activities are validly regulated…") (Second Opinion and Order at 29).[1]  However, the Court (and defendant's attorneys) has substituted the word driving for traveling in the plaintiffs' complaint, and has applied the States' term for the word driving.

_____

[1] The plaintiff did not admit to driving without a license plate or a driver's license, but he did admit to traveling without a license plate, and is scribed below as further evidence of the communication barrier:

"[: ~15-Januray-2019, for the claimant is traveling with the family-automobile (ARTICLE 9: U.C.C. ~ 102~23) on the public ways (ORS § 801.305 "Highway."). The automobile is a black BMW M3, with the production date of 2017:]." (Complaint and First Amended Complaint 16 at 6).

"[: ~15-Januray-2019: For the claimant is traveling with the family-automobile*16 on the public ways*17. For the family-automobile is a black BMW M3, with the production date of 2017:]." (Second Amended Complaint 36 at 6).

"This matter arises from plaintiff exercising his right to travel, and upon being deprived of that right by UOPD officers—Sitt, Brooks, Geeting, Barrett, and Morris—plaintiff exercised his rights to council, silence, and freedom from unreasonable search and seizure." (Plaintiffs' Objection and Motion for Performance of Contract at 3).

"Plaintiff's objection is notifying the Court of defendant's failure to rebut facts and matters of law addressed therein, and thereby, is requesting the Court take Judicial Notice of the facts within the record, that plaintiff may exercise his constitutional right to travel in the State of Oregon freely and unencumbered from the state's revised statutes." (Plaintiff's Reply to Defendant's Response [ECF No. 61] to Plaintiff's Objection and Motion for Performance of Contract and Affidavit [ECF No. 60] at 3).

"For the Plaintiff is traveling with the use of his private-property (family-automobile), and with the use of the public-ways to do so." (Id at 4).

"Plaintiff was traveling using his property—automobile, when he was stopped by UOPD Officer Sitts for not having a license plate on the rear of his automobile. (SAC 11, 20-21.)" (Plaintiff's Response in Opposition of Defendants' Motion to Dismiss the Second Amended Complaint at 3).

"Plaintiff, while traveling without a license plate, was pulled over by UOPD officer Sitts and detained.  Plaintiff informed the officer he was traveling, and thereby, not engaged in a licensed activity regulated by the State." (Plaintiffs' Reply to Defendant's Response to Plaintiff's Motion for Leave to Amend 1 at 4).

Thereby, the Court has prejudicially assumed jurisdiction for the defendants under Oregon Revised Statutes ("ORS" in citations) 810.010 that designates the bodies responsible—ORS 801.395 – "Police Officer"—for exercising jurisdiction over certain highways when the vehicle code—ORS 801.100 et seq.—requires the exercise of jurisdiction by the road authority under ORS 801.445 – "Road Authority".  Therefore, the Court dismissed the plaintiffs' claims for a deprivation of rights under Article I, Section 10, cl. 1, and the Fourth, Fifth, Sixth, Ninth, Thirteenth, and Fourteenth Amendments of the US Constitution, due to the Court concluding the plaintiff does not have a right to travel.

However, the plaintiff argues that he has an inherent right to travel by automobile pursuant to the Declaration of Independence and the US Constitution.  Thereby, he argues that he was not driving a vehicle pursuant to the definitions of regulated activity by the State.  As set forth below, there is no evidence the plaintiff was operating a "vehicle" in "commerce," as it has not been established that the plaintiff is subject to this statutory jurisdiction—[a] private law—by way of explicit or implied contract with the State of Oregon.

Therefore, because of the communication barrier between the plaintiff, attorneys for the defendants, and the Court.  The plaintiff provides the following overview for the right to travel, plaintiffs' rights in regards, the definitions for the terms of the words used in the plaintiffs' pleadings, and laws that apply.

## OVERVIEW OF THE RIGHT TO TRAVEL

If ever a judge understood the American People's right to use the public roads, it was Justice Tolman of the Supreme Court of the State of Washington.  Justice Tolman stated:

> "Complete freedom of the highways is so old and well established a blessing that we have forgotten the days of the Robber Barons and toll roads, and yet, under an act like this, arbitrarily administered, the highways may be completely monopolized, if, through lack of interest, the people submit, then they may look to see the most sacred of their liberties taken from them one by one, by more or less rapid encroachment." *Robertson vs. Department of Public Works*, 180 Wash 133, 147.

The words of Justice Tolman ring most prophetically in the ears of American People throughout the country today as the use of the public roads has been monopolized by the very entity which has been empowered to stand guard over our freedoms, that of state government.

## RIGHTS

The "most sacred of liberties" of which, Justice Tolman spoke was personal liberty which have been placed in conflict by the defendants.  The definition of personal liberty is:

"Personal liberty, or the Right to enjoyment of life and liberty, is one of the fundamental or natural Rights, which has been protected by its inclusion as a guarantee in the various constitutions, which is not derived from, or dependent on, the U.S. Constitution, which may not be submitted to a vote and may not depend on the outcome of an election. It is one of the most sacred and valuable Rights, as sacred as the Right to private property...and is regarded as inalienable" 16 C.J.S., Constitutional Law, Sect. 202, p.987.

This concept is further amplified by the definition of personal liberty:

"Personal liberty largely consists of the Right of locomotion --to go where and when one pleases-- only so far restrained as the Rights of others may make it necessary for the welfare of all other citizens.  The Right of the Citizen to travel upon the public highways and to transport his property thereon, by horse drawn carriage, wagon, or automobile, is not a mere privilege which may be permitted or prohibited at will, but the common Right which he has under his Right to life, liberty, and the pursuit of happiness.  Under this Constitutional guarantee one may, therefore, under normal conditions, travel at his inclination along the public highways or in public places, and while conducting himself in an orderly and decent manner, neither interfering with nor disturbing another's Rights, he will be protected, not only in his person, but in his safe conduct." [Emphasis added] 2 Am. Jur (1st) Constitutional Law, Sect. 329. p. ll35.

and further;

"Personal liberty consists of the power of locomotion, of changing situations, of removing one's person to whatever place one's inclination may direct, without imprisonment or restraint unless by due process of law." 1 Blackstone's Commentary 134; Hare, Constitution.777; Bouvier's Law Dictionary, 1914 ed., Black's Law Dictionary, 5th ed.

Justice Tolman was concerned about the State prohibiting the plaintiff from the "most sacred of his liberties," the Right of movement, the Right of moving one's self from place to place without threat of imprisonment; the Right to use the public roads in the ordinary course of life.  When the State allows the formation of a corporation it may control its creation by establishing guidelines (statutes) for its operation (charters).  Corporations who use the roads in the course of business, do not use the roads in the ordinary course of life.  There is a difference between a corporation and a live Individual.  The United States Supreme Court has stated:

"...We are of the opinion that there is a clear distinction in this particular between an individual and a corporation, and that the latter has no right to refuse to submit its books and papers for examination on the suit of the State.  The individual may stand upon his Constitutional Rights as a Citizen.  He is entitled to carry on his private business in his own way.  His power to contract is unlimited.  He owes no duty to the State or to his neighbors to divulge his business, or to open his doors to investigation, so far as it may tend to incriminate him.  He owes no such duty to the State since he receives nothing there from, beyond the protection of his life, liberty, and property. His Rights are such as the law of the land long antecedent to the organization of the state, and can only be taken from him by due process of law, and in accordance with the Constitution.  Among his Rights are the refusals to incriminate himself, and the immunity of himself and his property from arrest or seizure except under warrant of law.  He owes nothing to the public so long as he does not trespass upon their rights." *Hale vs. Hinkel*, 201 U.S. 43, 74-75, (1906).

"Upon the other hand, the corporation is a creature of the state.  It is presumed to be incorporated for the benefit of the public. It receives certain special privileges and franchises, and holds them subject to the laws of the state and the limitations of its charter. Its rights to act as a corporation are only preserved to it so long as it obeys the laws of its creation. There is a reserved right in the legislature to investigate its contracts and find out whether it has exceeded its powers. It would be a strange anomaly to hold that the State, having chartered a corporation to make use of certain franchises, could not in exercise of its sovereignty inquire how those franchises had been employed, and whether they had been abused, and demand the production of corporate books and papers for that purpose."  Id.

Corporations engaged in mercantile equity fall under the purview of the State's admiralty jurisdiction, and the public at large must be protected from their activities, as they (the corporations) are engaged in business for profit.

"...Based upon the fundamental ground that the sovereign state has the plenary control of the streets and highways in the exercise of its police power (see police power, infra.), may absolutely prohibit the use of the streets as a place for the prosecution of a private business for gain.  They all recognize the fundamental distinction between the ordinary Right of the Citizen to use the streets in the usual way and the use of the streets as a place of business or a main instrumentality of business for private gain.  The former is a common Right; the latter is an extraordinary use. As to the former the legislative power is confined to regulation, as to the latter it is plenary and extends even to absolute prohibition.  Since the use of the streets by a common carrier in the prosecution of its business as such is not a right but a mere license of privilege." *Hadfield vs. Lundin,* 98 Wash. 6571, 168, p. 516.

It will be necessary to review early cases and legal authority in order to reach a lawfully correct theory dealing with this Right or "privilege".  The plaintiff will attempt to reach a sound conclusion as to what is a "Right to use the road" and what is a "privilege to use the road".  Once reaching this determination, we shall then apply those positions to modern case decision.

"Where rights secured by the Constitution are involved, there can be no rule making or legislation which would abrogate them." *Miranda vs. Arizona,* 384 U.S. 436, 491, (1966).

and...

"The claim and exercise of a constitutional Right cannot be converted into a crime." *Miller vs. United States*, 230 V. 486,489, (1956).

and...

"There can be no sanction or penalty imposed upon one because of this exercise of constitutional Rights." *Sherar vs. Cullen*, 481 F. 2d 946, (1973).

Thereby, streets and highways are established and maintained for the purpose of travel and transportation by the public.  Such travel may be for business or pleasure.

"The right of a citizen to travel upon the public highways and to transport his property thereon in the ordinary course of life and business is a common right which he has under his right to enjoy life and liberty, to acquire and possess property, and to pursue happiness and safety. It includes the right in so doing to use the ordinary and usual conveyances of the day; and under the existing modes of travel includes the right to drive a horse-drawn carriage or wagon thereon, or to operate an automobile thereon, for the usual and ordinary purposes of life and business. It is not a mere privilege, like the privilege of moving a house in the street, operating a business stand in the street, or transporting persons or property for hire along the street, which a city may permit or prohibit at will. *Thompson v. Smith*, 154 S.E. 579, 155 Va. 367 (Va. 1930).

and...

"Even the legislature has no power to deny to a citizen the right to travel upon the highway and transport his property in the ordinary course of his business or pleasure…" *Chicago Coach Co. v. City of Chicago*, 169 N.E. 22 (Ill. 1929).

A person has a Right to travel upon the public highways by automobile and that person cannot be rightfully deprived of his Liberty. So where does the misconception that the use of the public road is always and only a privilege come from?

"...For while a Citizen has the Right to travel upon the public highways and to transport his property thereon, that Right does not extend to the use of the highways, either in whole or in part, as a place for private gain. For the latter purpose no person has a vested right to use the highways of the state, but is a privilege or a license which the legislature may grant or withhold at its discretion." *State vs. Johnson*, 243 P. 1073 (1926); *Hadfield*, supra; *Cummins vs. Homes*, 155 P. 171; *Packard vs. Banton*, 44 S. Ct. 256 (1924);

Here the courts held that a person has the Right to travel upon the public highways, but that he did not have the right to conduct business upon the highways. On this point of law all authorities are unanimous.

"Heretofore the court has held, and we think correctly, that while a Citizen has the Right to travel upon the public highways and to transport his property thereon, that Right does not extend to the use of the highways, either in whole or in part, as a place of business for private gain." *Barney vs. Board of Railroad Commissioners*, 17 P.2d 82 (1932); *Willis vs. Buck*, 263 P. 982 (1928).

and...

"The right of the citizen to travel upon the highway and to transport his property thereon, in the ordinary course of life and business, differs radically and obviously from that of one who makes the highway his place of business for private gain in the running of a stagecoach or omnibus." *State vs. City of Spokane*, 186 P. 864 (1920).

What is this Right of the person which differs so "radically and obviously" from one who uses the highway as a place of business? Who better to enlighten us than Justice Tolman of the Supreme

Court of Washington? In State vs. City of Spokane, supra, the Court also noted a very "radical and obvious" difference, but went on to explain just what the difference is:

> "The former is the usual and ordinary right of the Citizen, a common right to all, while the latter is special, unusual, and extraordinary." "This distinction, elementary and fundamental in character, is recognized by all the authorities." *State vs. City of Spokane*, supra.

This position does not hang precariously upon only a few cases, but has been proclaimed by an impressive array of cases ranging from the state courts to the federal courts.

> "...the right of the Citizen to travel upon the highway and to transport his property thereon in the ordinary course of life and business, differs radically and obviously from that of one who makes the highway his place of business and uses it for private gain in the running of a stagecoach or omnibus. The former is the usual and ordinary right of the Citizen, a right common to all, while the latter is special, unusual, and extraordinary." *Ex Parte Dickey*, (*Dickey vs. Davis*), 85 So. 782 (1915).

> and...

> "The right of the Citizen to travel upon the public highways and to transport his property thereon, in the ordinary course of life and business, is a common right which he has under the right to enjoy life and liberty, to acquire and possess property, and to pursue happiness and safety. It includes the right, in so doing, to use the ordinary and usual conveyances of the day, and under the existing modes of travel, includes the right to drive a horse drawn carriage or wagon thereon or to operate an automobile thereon, for the usual and ordinary purpose of life and business." *Teche Lines vs. Danforth*., 12 So. 2d 784 (1943); *Thompson vs. Smith*, supra.

There is no dissent among various authorities as to this position.  See A.M. Juris. (1st) Const. Law, 329 and corresponding A.M. Juris. 2nd.

> "Personal liberty -- or the right to enjoyment of life and liberty -- is one of the fundamental or natural rights, which has been protected by its inclusion as a guarantee in the various constitutions, which is not derived from nor dependent on the U.S. Constitution * * * It is one of the most sacred and valuable rights [remember the words of Justice Tolman, supra.] as sacred as the right to Private property...and is regarded as inalienable." 16 C.J.S. Const. Law, Sect. 202, p.987.  (emphasis mine).

As we can see, the distinction between a "Right" to use the public roads and a "privilege" to use the public roads is drawn upon the line of "using the road as a place of business" and the various state courts have held so.  But what have the U.S. courts held on this point?

> "First, it is well established law that the highways of the state are public property, and their primary and preferred use is for private purposes, and that their use for purposes of gain is special and extraordinary which, generally at least, the legislature may prohibit or condition as it sees fit." *Stephenson vs. Binford*, 287 U. S. 251 (1932); *Packard vs. Banton*, 264 U. S. 140 (1924), and cases cited; *Frost Trucking Co. vs. Railroad Commission*, 271 U. S. 582 (1926); *Railroad

*commission vs. Jater-City Forwarding Co*., 57 S.W.2d 290; *Parlett Cooperative vs. Tidewater Lines*, 164 A. 313.

So, what is a privilege to use the roads? By now it should be apparent even to the "learned" that an attempt to use the road use as a place of business is a privilege. The distinction must be drawn between (1) Traveling upon and transporting one's property upon the public roads, which is our Right; and (2) Using the public roads as a place of business or a main instrumentality of business, which is a privilege:

"[The roads] * * * are constructed and maintained at public expense, and no person therefore, can insist that he has, or may acquire, a vested right to their use in carrying on a commercial business." *Ex Parte Sterling*, 53 S.W. 2d 294; *Barney vs. Railroad Commissioners*, 17 P. 2d 82 (1932); *Stephenson vs. Binford*, supra.

"When the public highways are made the place of business the state has a right to regulate their use in the interest of safety and convenience of the public as well as the preservation of the highways." *Barney vs. Railroad Commissioners*, supra.

"[The state's] right to regulate such use is based upon the nature of the business and the use of the highways in connection therewith." Id.

"We know of no inherent right in one to use the highways for commercial purposes. The highways are primarily for the use of the public, and in the interest of the public, the state may prohibit or regulate the use of the highways for gain." *Robertson vs. Dept. of Public Works*, supra.

There should be considerable authority on a subject considering the importance of this deprivation on the liberty of the individual "using the roads in the ordinary course of life and business." However, it should be noted that extensive research has not turned up one case or authority acknowledging the state's power to convert the individual's right to travel upon the public roads into a "privilege". Therefore, it must be concluded that a person does have a "Right" to travel and transport their property upon the public highways and roads and the exercise of this Right and it is not a "privilege".

## DEFINITIONS

In order to understand the correct application of the statute in question, we must first define the terms used in connection with this point of law.  As will be shown, many terms used today do not, in their legal context, mean what we assume they mean, thus resulting in the misapplication of statutes in the instant case.

## AUTOMOBILE AND MOTOR VEHICLE

There is a clear distinction between an automobile and a motor vehicle.  An automobile has been defined as:

"The word 'automobile' connotes a pleasure vehicle designed for the transportation of persons on highways." *American Mutual Liability Ins. Co., vs. Chaput*, 60 A. 2d 118, 120; 95 NH 200.

"A carriage is peculiarly a family or household article.  It contributes in a large degree to the health, convenience, comfort, and welfare of the householder or of the family." *Arthur v Morgan*, 113 U.S. 495, 500, 5 S. Ct. 241, 243 S.D. NY 1884

"The Supreme Court, in *Arthur v. Morgan*, 112 U.S. 495, 5 S. Ct. 241, 28 L. Ed. 825, held that carriages were properly classified as household effects, and we see no reason that automobiles should not be similarly disposed of." *Hillhouse v United States*, 152 F. 163, 164 (2nd Cir. 1907).

And, U.C.C. § 9 (23) defines "Consumer goods" to means goods that are used or bought for use primarily for personal, family, or household purposes."  Furthermore, the distinction between an automobile and a motor vehicle is made clear between the two, as the courts have stated:

"A motor vehicle or automobile for hire is a motor vehicle, other than an automobile stage, used for the transportation of persons for which remuneration is received." *International Motor Transit Co. vs. Seattle* 251 P. 120.

The term 'motor vehicle' is different and broader than the word 'automobile'." *City of Dayton vs. DeBrosse*, 23 N.E. 2d 647, 650; 62 Ohio App. 232.

Moreover, the distinction is made very clear in United State Code, Title 18, §31:

"Motor vehicle" means every description or other contrivance propelled or drawn by mechanical power and used for commercial purposes on the highways in the transportation of passengers, or passengers and property.

"Used for commercial purposes" means the carriage of persons or property for any fare, fee, rate, charge or other considerations, or directly or indirectly in connection with any business, or other undertaking intended for profit.

Moreover, the State of Oregon makes the distinction with its revised statutes:

"Commercial vehicle." "Commercial vehicle" means a vehicle that: (1) Is used for the transportation of persons for compensation or profit; or (2) Is designed or used primarily for the transportation of property.  ORS 801.210

Definitions: (1) "Carrier" or "motor carrier" means for-hire carrier or private carrier; (2) "Cartage carrier" means any person who undertakes to transport any class of property by motor vehicle for compensation when the transportation is performed wholly within an incorporated city or a commercial zone adjacent to an incorporated city.  ORS 825.005

Definitions: (7) "For-hire carrier" means: (a) Any person who transports persons or property for hire or who publicly purports to be willing to transport persons or property for hire by motor vehicle; or (b)Any person who leases, rents or otherwise provides a motor vehicle to the

public and who in connection therewith in the regular course of business provides, procures or arranges for, directly, indirectly or by course of dealing, a driver or operator therefor.  ORS 825.005

Definitions: (9) "Motor vehicle" means any self-propelled vehicle and any such vehicle in combination with any trailing units, used or physically capable of being used upon any public highway in this state in the transportation of persons or property, except vehicles operating wholly on fixed rails or tracks and electric trolley buses. "Motor vehicle" includes over dimension vehicles or vehicles permitted excessive weights pursuant to a special authorization issued by a city, county or the Department of Transportation.

Definitions: (11) "Private carrier" means any person who operates a motor vehicle over the public highways of this state for the purpose of transporting persons or property when the transportation is incidental to a primary business enterprise, other than transportation, in which such person is engaged.  ORS 825.005

Thereby, it is clear, that an automobile is private property in use for private purposes, while a motor vehicle is a machine, which may be used upon the highways for trade, commerce, or hire.

## TRAVEL

The term "travel" in this case is a significant term and is defined as:

"The term 'travel' and 'traveler' are usually construed in their broad and general sense...so as to include all those who rightfully use the highways viatically when being reimbursed for expenses and who have occasion to pass over them for the purpose of business, convenience, or pleasure."  25 A.M. Juris. (1st) Highways, Sect. 427, p.717.

"Traveler" – One who passes from place to place, whether for pleasure, instruction, business, or health."  Locket vs. State, 47 Ala. 45; Bouvier's Law Dictionary, 1914 ed., p. 3309.

"Travel – To journey or to pass through or over; as a country district, road, etc.  To go from one place to another, whether on foot, or horseback, or in any conveyance as a train, an automobile, carriage, ship, or aircraft; make a journey." Century Dictionary, p. 2034.

"Traveler" – Someone who passes from place to place, for any reason.  Black's Law Dictionary 10 Ed. at 1729.

Therefore, the term "travel" or "traveler" refers to one who uses a conveyance— automobile—to go from one place to another and includes all those who use the highways as a matter of Right.  Notice that in all these definitions the phrase "for hire" never occurs. This term "travel" or "traveler" implies by definition one who uses the road as a means to move from one place to another. Therefore, one who uses the road in the ordinary course of life and business for the purpose of travel and transportation is a traveler.

## DRIVER

The term "driver" in contradistinction to "traveler" is defined as:

"Driver—One employed in conducting a coach, carriage, wagon, or other vehicle..." Bouvier's Law Dictionary, 1914 ed., p. 940.

Notice that this definition includes one who is "employed" in conducting a vehicle. It should be self-evident that this person could not be "traveling" on a journey, but is using the road as a place in the conduct of business.

## OPERATOR

Today we assume that a "traveler" is a "driver," and a "driver" is an "operator." However, this is not the case.

"It will be observed from the language of the ordinance that a distinction is to be drawn between the terms 'operator' and 'driver'; the 'operator' of the service car being the person who is licensed to have the car on the streets in the business of carrying passengers for hire; while the 'driver' is the one who actually drives the car. However, in the actual prosecution of business, it was possible for the same person to be both 'operator' and 'driver'." *Newbill vs. Union Indemnity Co.*, 60 S.E. 2d 658.

To further clarify the definition of an "operator" the Court observed that this was a vehicle "for hire" and that it was in the business of carrying passengers. This definition would seem to describe a person who is using the road as a place of business, or in other words, a person engaged in the "privilege" of using the road for gain. This definition then is a further clarification of the distinction mentioned earlier and therefore: (1) traveling upon and transporting one's property upon the public roads as a matter of Right meets the definition of a traveler; and (2) using the road as a place of business as a matter of privilege meets the definition of a driver or an operator or both.

## TRAFFIC

Having defined the terms "automobile," "motor vehicle," "traveler," "driver," and "operator," the next term to define is "traffic":

"...traffic thereon is to some extent destructive, therefore, the prevention of unnecessary duplication of auto transportation service will lengthen the life of the highways or reduce the cost of maintenance, the revenue derived by the state...will also tend toward the public welfare by producing at the expense of those operating for private gain, some small part of the cost of repairing the wear." *Northern Pacific R.R. Co. vs. Schoenfeldt*, 213 P. 26.

In the above, Justice Tolman expounded upon the key of raising revenue by taxing the "privilege" to use the public roads "at the expense of those operating for gain."  In this case, the word "traffic" is used in conjunction with the unnecessary Auto Transportation Service, or in other words, "vehicles for hire."  The word "traffic" is another word, which is to be strictly construed to the conducting of business.

> "Traffic-- Commerce, trade, sale or exchange of merchandise, bills, money, or the like. The passing of goods and commodities from one person to another for an equivalent in goods or money..." Bouvier's Law Dictionary, 1914 ed., p. 3307.

Here again, notice that this definition refers to one "conducting business."  No mention is made of one who is traveling in his automobile.  This definition is of one who is engaged in the passing of a commodity or goods in exchange for money, i.e. vehicles for hire. Furthermore, the word "traffic" and "travel" must have different meanings, which the counts recognize.  The difference is recognized in *Ex Parte Dickey*, supra:

> "...In addition to this, cabs, hackney coaches, omnibuses, taxicabs, and hacks, when unnecessarily numerous, interfere with the ordinary traffic and travel and obstruct them."

The court, by using both terms, signified its recognition of a distinction between the two. What was the distinction?  See above, as we have already defined both terms.  Now to nail the matter down:

> "The word 'traffic' is manifestly used here in secondary sense, and has reference to the business of transportation rather than to its primary meaning of interchange of commodities." Allen vs. City of Bellingham, 163 P. 18 (1917).

Here the Supreme Court of the State of Washington has defined the word "traffic" (in either its primary or secondary sense) in reference to business, and not to mere travel. It is clear that the term "traffic" is business related and therefore, it is a "privilege."  The net result being that "traffic" is brought under the (police) power of the legislature. The term has no application to one who is not using the roads as source of income or a place of business.

## LICENSE

It seems only proper to define the word license," as the definition of this word will be extremely important in understanding the statutes as they are properly applied:

> "The permission, by competent authority to do an act which without permission, would be illegal, a trespass, or a tort."  *People vs. Henderson*, 2l8 N.W. 2d 2, 4.

"Leave to do a thing which licensor could prevent." *Western Electric Co. vs. Pacent Reproducer Corp.*, 42 F. 2d 116,118.

In order for these two definitions to apply in this case, the state would have to prove the position that the exercise of a Constitutional Right to use the public roads in the ordinary course of life and business is illegal, a trespass, or a tort, which the state could then regulate or prevent. This position, however, would raise constitutional questions, as this position would be diametrically opposed to fundamental constitutional law. (See "Conversion of a Right to a Crime," infra.)  In the instant case, the proper definition of a "license" is:

"a permit, granted by an appropriate governmental body, generally for consideration, to a person, firm, or corporation, to pursue some occupation or to carry on some business which is subject to regulation under the police power." *Rosenblatt vs. California State Board of Pharmacy*, 158 P. 2d 199, 203.

This definition would fall more in line with the "privilege" of carrying on business on the streets. Most people tend to think that "licensing" is imposed by the state for the purpose of raising revenue, yet there may well be more subtle reasons contemplated; for when one seeks permission from someone to do something, he invokes the jurisdiction of the "licensor" which, in this case, is the state. In essence, the licensee may well be seeking to be regulated by the "licensor."

"A license fee is a charge made primarily for regulation, with the fee to cover costs and expenses of supervision or regulation." *State vs. Jackson*, 60 Wisc. 2d 700; 211 N.W. 2d 480, 487.

The fee is the price; the regulation or control of the licensee, which is the real aim of the legislation.  Are these licenses really used to fund legitimate government or are they nothing more than a subtle introduction of police power into every facet of our lives? Have our "enforcement agencies" been diverted from crime prevention, perhaps through no fault of their own, now busying themselves as they "check" our papers to see that all are properly endorsed by the state?  At which Legislative Session will it be before we are forced to get a license for Lawnmowers, Generators, Tillers, and Air Conditioners or before people are required to have a license for their "blender" or "mixer?"  All have motors on them and the state can always use the revenue.  At what point does the steady encroachment into our Liberty cease?

## POLICE POWER

The confusion of the police power with the power of taxation usually arises in cases where the police power has affixed a penalty to a certain act or omission to act, or where it requires licenses to be obtained and a certain sum be paid for certain occupations.  The power used in the instant case cannot

however, be the power of taxation since an attempt to levy a tax upon a Right would be open to constitutional objection. (See "taxing power," infra.)

Each law relating to the legitimate use of police power must ask three questions: (1) Is there threatened danger? (2) Does a regulation involve a constitutional Right? (3) Is the regulation reasonable? *People vs. Smith*, 108 Am. St. Rep. 715; Bouvier's Law Dictionary, 1914 ed., under "Police Power."

When applying these three questions to the statute in question, some very important issues are clarified. First, "is there a threatened danger" in the individual using his automobile on the public highways, in the ordinary course of life and business? The answer is No.

There is nothing inherently dangerous in the use of an automobile when it is carefully managed. Their guidance, speed, and noise are subject to a quick and easy control, under a competent and considerate manager, it is as harmless on the road as a horse and buggy, possibly more so. It is the manner of managing the automobile and that alone, which threatens the safety of the public. The ability to stop quickly and to respond quickly to guidance would seem to make the automobile one of the least dangerous conveyances. (See Yale Law Journal, December, 1905.)

"The automobile is not inherently dangerous." *Cohens vs. Meadow*, 89 SE 876; *Blair vs. Broadwater*, 93 SE 632 (1917).

To deprive all persons of the Right to use the road in the ordinary course of life and business, because one might in the future, become dangerous, would be a deprivation not only of the Right to travel, but also the Right to due process. (See "Due Process," infra.)

Second, does the regulation involve a constitutional Right? This question has already been addressed and answered in this brief, and need not be reinforced other than to remind this Court that the plaintiff does have the Right to travel upon the public highway by automobile in the ordinary course of life and business. It can therefore be concluded that this regulation does involve a constitutional Right. And the third question is the most important in this case. "Is this regulation reasonable?" The answer is No.

It will be shown later in "Regulation," infra, that this licensing statute is oppressive and could be effectively administered by less oppressive means. Although the Fourteenth Amendment does not interfere with the proper exercise of the police power in accordance with the general principle that the power must be exercised so as not to invade the rights guaranteed by the United States Constitution, it is established beyond question that every state power, including the police power, is limited by the Fourteenth Amendment (and others) and by the inhibitions there imposed. Moreover, the ultimate test of the propriety of police power regulations must be found in the Ninth Amendment, since it operates as a bulwark to limit the field of the police power to the extent of preventing the enforcement of statutes in denial of Rights that the Constitution protects. (See *Parks vs. State*, 64 N.E. 682 (1902)).

"With regard particularly to the U.S. Constitution, it is elementary that a Right secured or protected by that document cannot be overthrown or impaired by any state police authority." *Connolly vs. Union Sewer Pipe Co*., 184 U. S. 540 (1902); *Lafarier vs. Grand Trunk R.Y. Co*., 24 A. 848 (1892); *O'Neil vs. Providence Amusement Co*., 103 A. 887.

"The police power of the state must be exercised in subordination to the provisions of the U.S. Constitution." *Panhandle Eastern Pipeline Co*. *vs. State Highway Commission*, 294 U. S. 613 (1935); *Buchanan vs. Warley*, 245 U.S. 60 (1917).

"It is well settled that the Constitutional Rights protected from invasion by the police power, include Rights safeguarded both by express and implied prohibitions in the Constitutions." *Tighe vs. Osborne*, 131 A. 60 (1925).

"As a rule, fundamental limitations of regulations under the police power are found in the spirit of the Constitutions, not in the letter, although they are just as efficient as if expressed in the clearest language." *Mehlos vs. City of Milwaukee*, 146 N. W. 882 (1914).

As it applies in the instant case, the language of the Fifth Amendment is clear, "No person shall be deprived of Life, Liberty, or Property without due process of law. And, as has been demonstrated, the courts at all levels have firmly established an absolute Right to travel. In this case, the state by applying commercial statutes to all entities, natural and artificial persons alike, has deprived the plaintiff, a free and natural person, of the Right of Liberty without cause and without due process of law.

## DUE PROCESS

"The essential elements of due process of law are…Notice and the Opportunity to defend." *Simon vs. Craft*, 182 U. S. 427 (1901).

Yet, not one individual has ever been given notice of the loss of his/her Right, before signing the license (contract). Nor was the plaintiff given any opportunity to defend against the loss of his/her right to travel by automobile on the highways, in the ordinary course of life and business. This amounts to an arbitrary government deprivation on Liberty.

"There should be no arbitrary deprivation of Life or Liberty..." *Barbier vs. Connolly*, 113 U.S. 27, 31 (1885); *Yick Wo vs. Hopkins*, 1l8 U.S. 356 (1886).

And further,

"The right to travel is part of the Liberty of which a Citizen cannot deprived without due process of law under the Fifth Amendment. This Right was emerging as early as the Magna Carta." *Kent vs. Dulles*, 357 U.S. 116 (1958).

The focal point of this question of police power and due process must balance upon the point of making the public highways a safe place for the public to travel. If a man travels in a manner that creates actual damage, an action in law would be the appropriate civil remedy for recovery of damages.

The state could then also proceed against the Individual to deprive him of his Right to use the public highways, for Cause.  This process would fulfill the due process requirements of the Fifth Amendment while at the same time ensuring that Rights guaranteed by the Constitution for the United States of America and the respective state constitutions would be protected for all.

But unless or until harm or damage—a Crime—is committed, there is no cause for interference in the private affairs or actions of an individual.  One of the most famous and perhaps the most quoted definitions of due process of law is that of Daniel Webster in his Dartmouth College Case, 4 Wheat 518 (1819), in which he declared that due process means "a law which hears before it condemns, which proceeds upon inquiry, and renders judgment only after trial." (See also *State vs. Strasburg,* 110 P. 1020 (1910); *Dennis vs. Moses*, 52 P. 333.)

Somewhat similar is the statement that is a rule as old as the law that "no one shall be personally bound (restricted) until he has had his day in court," until he has been duly summoned to appear and has been afforded an opportunity to be heard.  Judgment without such summons and opportunity lacks all the attributes of a judicial determination; it is judicial usurpation and it is oppressive and can never be upheld where it is unfairly administered. (12 Am. Jur. [1st] Const. Law, Sect. 573, p.269.)

This sounds like the process used to deprive one of the "Privilege" of operating a motor vehicle "for hire."  It should be kept in mind, however, that we are discussing the arbitrary deprivation of the Right to use the road that all people have "in common."

The futility of the state's position can be most easily observed in the A.D. 1959 Washington Attorney General's opinion on a similar issue: (1) "The distinction between the Right of the Citizen to use the public highways for private, rather than commercial purposes is recognized..."; and (2) "Under its power to regulate private uses of our highways, our legislature has required that motor vehicle operators be licensed (I.C. 49-307).  Undoubtedly, the primary purpose of this requirement is to insure, as far as possible, that all motor vehicle operators will be competent and qualified, thereby reducing the potential hazard or risk of harm, to which other users of the highways might otherwise be subject.  But once having complied with this regulatory provision, by obtaining the required license, a motorist enjoys the privilege of traveling freely upon the highways..."  Washington A.G.O. 59-60 No. 88, p. 11.

This alarming opinion appears to be saying that every person using an automobile as a matter of right, must give up the Right and convert the Right into a "privilege".  See the definition of ORS 801.360 – "Motor Vehicle" that means a vehicle that is self-propelled or designed for self-propulsion. However, this is accomplished under the guise of regulation.  This statement is indicative of the insensitivity, even the pretended ignorance of the government to the restrictions placed upon government by and through the several constitutions.

That legal proposition may have been able to stand in 1959; however, as of 1966, the United States Supreme Court decision in Miranda, clearly demonstrated that even this weak defense of the state's actions must fail, "Where rights secured by the Constitution are involved, there can be no rule making or legislation which would abrogate them." *Miranda vs. State of Arizona*, 384 U.S. 436,491 (1966).

Thus, the legislature does not have the power to abrogate the Citizen's Right to travel upon the public roads, by passing legislation forcing the citizen to waive his Right and convert that Right into a privilege.  Furthermore, we have previously established that this "privilege" has been defined as applying only to those who are "conducting business in the streets" or "operating for-hire vehicles."  The legislature has attempted, by legislative fiat, to deprive the plaintiff of his Right to use the roads in the ordinary course of life and business, without affording the plaintiff the safeguard of "due process of law."  This has been accomplished under supposed powers of regulation.  – violates bill of attainer clause!

## REGULATION

"In addition to the requirement that regulations governing the use of the highways must not be violative of constitutional guarantees, the prime essentials of such regulation are reasonableness, impartiality, and definiteness or certainty."  25 Am. Jur. (1st) Highways, Sect. 260.

and...

"Moreover, a distinction must he observed between the regulation of an activity which may be engaged in as a matter of right and one carried on by government sufferance of permission."  *Davis vs. Massachusetts*, 167 U.S. 43; *Pachard vs. Banton,* supra.

One can say for certain that these regulations are impartial since they are being applied to all, even though they are clearly beyond the limits of the legislative power.  However, we must consider whether such regulations are reasonable and non-violative of constitutional guarantees.  First, let us consider the reasonableness of this statute requiring all persons to be licensed (presuming that we are applying this statute to all persons using the public roads).  In determining the reasonableness of the statute, we need only ask two questions.  Does the statute accomplish its stated goal?  The answer is No.

The attempted explanation for this regulation "to ensure the safety of the public by insuring, as much as possible, that all are competent and qualified."  However, one can keep his license without resetting, from the time he/she is first licensed until the day he/she dies, without regard to the competency of the Person, by merely renewing said license before it expires.  It is therefore possible to completely skirt the goal of this attempted regulation, thus proving that this regulation does not accomplish its goal.

If an analysis were compiled of all accidents between those individuals having license and those who do not, it would reveal that the highest percentage of accidents were had by those who had licenses. [A] license does not in and of its self, guarantee the safety of the general public.  Much like the

License to Practice Law or Medicine assure that only competent Lawyers and Doctors ply their trade.  A review of the annual Malpractice lawsuits is the only proof necessary to establish that it does not.

Furthermore, by testing and licensing, the state gives the appearance of underwriting the competence of the licensees, and could therefore be held liable for failures, accidents, etc. caused by licensees as the state has certified through the issuance of the license that the individual is competent.  Is the statute reasonable?  The answer is No.

This statute cannot be determined to be reasonable since it requires the Citizen to give up his or her natural Right to travel unrestricted in order to accept the (regulated) privilege.  The purported goal of this statute could be met by much less oppressive regulations, i.e., competency tests and certificates of competency before using an automobile upon the public roads.  (This is exactly the situation in the aviation sector.)  But isn't this what we have now?  The answer is No.

The real purpose of this license is much more insidious. When one signs the license, he/she gives up his/her Constitutional Right to travel in order to accept and exercise a privilege under Contract. After signing the license, a quasi-contract giving the State a statutory-jurisdiction, the Citizen has given the State his/her consent to be prosecuted for constructive crimes and quasi-criminal actions where there is no harm done and no damaged property.  These prosecutions take place without affording the Citizen their constitutional Rights and guarantees such as the Right to a trial by jury of twelve persons and the Right to counsel, as well as the normal safeguards such as proof of intent, a corpus delicti, and a grand jury indictment. These unconstitutional prosecutions take place because the Citizen is exercising a privilege and has given his/her "implied consent" to legislative enactments designed to control interstate commerce, a regulated enterprise under the police power of the state.

We must now conclude that the Citizen is forced to give up constitutional guarantees of "Right" in order to exercise his state "privilege" to travel upon the public highways in the ordinary course of life and business.

## SURRENDER OF RIGHTS

[A] Citizen cannot be forced to give up his/her Rights in the name of regulation:

"...The only limitations found restricting the right of the state to condition the use of the public highways as a means of vehicular transportation for compensation are that the state must not exact of those it permits to use the highways for hauling for gain that they surrender any of their inherent U.S. Constitutional Rights as a condition precedent to obtaining permission for such use..."  *Riley vs. Lawson*, 143 So. 619 (1932); *Stephenson vs. Binford*, supra.

If one cannot be placed in a position of being forced to surrender Rights—see the *Involuntary Servitude Clause* under the Thirteenth Amendment of the US Constitution—in order to exercise a privilege, how much more must this maxim of law, then, apply when one is simply exercising

(putting into use) a Right?  (*Hoke vs. Henderson*, 15 NC 15) "To be that statute which would deprive a Citizen of the rights of person or property, without a regular trial, according to the course and usage of the common law, would not be the law of the land." Further, "In the circumstances of this case, it is intolerable that one constitutional right should have to be surrendered in order to assert another." *Simons vs. United States*, 390 U.S. 377 (1968).

Since the state requires that the plaintiff give up Rights in order to exercise the privilege of driving, the regulation cannot stand under the police power, due process, or regulation, but must be exposed as a statute which is oppressive and one which has been misapplied to deprive the plaintiff of Rights guaranteed by the United States Constitution and the State Constitution.

## TAXING POWER

Any claim that this statute is a taxing statute would be immediately open to severe Constitutional objections.  If it could be said that the state had the power to tax a Right, this would enable the state to destroy Rights guaranteed by the constitution through the use of oppressive taxation.  The question herein, is one of the State taxing the Right to travel by the ordinary modes of the day, and whether this is a legislative object of the state taxation.

"The views advanced herein are neither novel nor supported by authority. The Supreme Court has repeatedly considered the question of taxing power of the states.  The Right of the state to impede or embarrass the Constitutional operation of the U.S. Government or the Rights which the Citizen holds under it, has been uniformly denied." *McCulloch vs. Maryland*, 17 U. S. (4 Wheat) 316 (1819).

The power to tax is the power to destroy, and if the state is given the power to destroy Rights through taxation, the framers of the Constitution wrote that document in vain.

"...It maybe said that a tax of one dollar for passing through the state cannot sensibly affect any function of government or deprive a Citizen of any valuable Right.  But if a state can tax...a passenger of one dollar, it can tax him a thousand dollars." *Crandall vs. Nevada,* 75 U. S. (6 Wall) 35, 46, (1867).

and...

"If the Right of passing through a state by a Citizen of the United States is one guaranteed by the Constitution, it must be sacred from state taxation." Id.

Therefore, the Right of travel must be kept sacred from all forms of state taxation and if this argument is used by the state as a defense of the enforcement of this statute, then this argument also must fail.

## CONVERSION OF A RIGHT TO A CRIME

As previously demonstrated, the plaintiff has the Right to travel and to transport his property upon the public highways in the ordinary course of life and business. However, if the plaintiff exercises his Right to travel (without first giving up the Right and converting that Right into a privilege) the plaintiff is by statute, guilty of a crime. This amounts to converting the exercise of a Constitutional Right into a crime. Recall the *Miller vs. United States* and *Sherar vs. Cullen* quotes set forth above, that hold: (1) "The state cannot diminish Rights of the people." *Hurtado vs. California*, 110 U. S. 516 (1883); and (2) "Where rights secured by the Constitution are involved, there can be no rule making or legislation which would abrogate them." *Miranda*, supra.

Indeed, the very purpose for creating the state under the limitations of the constitution was to protect the rights of the people from intrusion, particularly by the forces of government. So, we can see that any attempt by the legislature to make the act of using the public highways as a matter of Right into a crime, is void upon its face. As the plaintiff has already shown, the term "driving" can only apply to those who are employed in the business of transportation for hire. It has been shown that freedom includes the plaintiffs' Right to use the public highways in the ordinary course of life and business without license or regulation by the police powers of the State.

## TITLE OF NOBILITY

The Constitution for the United States of America at Article I, Section 10, Clause 1 prohibits the granting of a Title of Nobility – "No state shall grant a Title of Nobility." Since the granting of a title of nobility is absolutely prohibited the Court lacks subject matter jurisdiction to enforce a title of nobility and its attendant rules and regulations. The Utah Supreme Court has held:

"Ability to drive a motor vehicle on a public roadway is not a fundamental right, but a revocable privilege." *City of Salina vs. Wisden*, 737 P. 2d 981 – The distinctive appellation, designation or title "driver" is a title of privilege, a title of "Noble Privilege" a "Title of Nobility".

In the words of Thomas L. Willmore, City Attorney for the City of Tremonton, Utah (case No. 94-0336, Tremonton City Justice Court), "A Title of Nobility is defined as to nominate to an order of persons to whom privileges are granted * * * objection to a Title of Nobility arises from the special privileges that attach to the title rather than to the title itself. Words and Phrases, volume 8A, page 40. A Driver License is * * * a privilege which is granted ... by the State (a municipal corporation)."

In other words, to obtain a driver's-license is to be nominated to an order of persons known as drivers and be granted the special privileges that attach to the title. As set forth above, the United States

Constitution at Article 1 Section 10 prohibits the States from granting a "Title of Nobility" (i.e. a driver's-license and its attendant rules and regulations).

Pursuant to *City of Salina vs. Wisden*, the Driver License and its attendant rules and regulations are by legal definition a Title of Nobility. Article 1 Section 10 of the United States Constitution prohibits the States from granting "Title of Nobility". The Court lacks subject matter jurisdiction to enforce upon the defendant a "Title of Nobility". What is prohibited to the States is forbidden to the Court to enforce. *California Motor Transport Co. vs. Trucking Unlimited*, 404 U.S. 908 (1972). Therefore, the plaintiff requests the Court to make a legal determination as to what is a Title of Nobility. The following case law will define a title of nobility for the Court to use to make its determination. The following quotes give the answer:

"NOBILITY. An order of man, in several countries, to whom special privileges are granted at the expense of the rest of the people." Bouvier's Law Dictionary (l870).

and;

"To confer a title of nobility, is to nominate to an order of persons to whom privileges are granted at the expense of the rest of the people. It is not necessarily hereditary, and the objection to it arises more from the privileges supposed to be attached, than to the otherwise empty title or order." *Horst vs. Moses* (1872), 48 Ala. 129, 142; 46 Corpus Juris 598, Nobility, note 4; (1874).

Bouvier's Law Dictionary, Nobility:

"These component... terms 'privilege', 'honor', and 'emolument... are collectively in the term 'title of nobility'." HORST vs. MOSES (1872), 48 Ala. 129, at 142

Government granted: entitlement-privileges, such as a Driver's-License and its privileges, are obviously Noble entitlements and franchises as pointed out by Richard B. Stewart, left-wing politician, Rhodes Scholar and Harvard Law Professor:

"The third great innovation in American administrative law, which has largely occurred during the past 20 years, extended the procedural controls and principles of judicial review developed in the context of regulatory decision-making to the operations of the welfare state, including programs of government insurance and assistance, government employment decisions, and the administration of government grants and contracts. Under traditional private law principles, these benefits were "privileges" and not "rights" because their withholding did not constitute the commission of a tort or other natural law wrong against a disappointed applicant or terminated recipient. With the growth of the post-World War II welfare state, the distinction between rights and privileges gradually eroded. Statutes conveying these various benefits and advantages were held by courts to create entitlements..." The Limits of Administrative Law, in the Courts: Separation of Powers, Final Report on the 1983 Chief Justice Earl Warren Conference on Advocacy; page 77 Library of Congress #83-061923.

The Constitution for the United-States of America at Art. I, Section 10, cl. 1, mandates: "No State shall * * * grant any Title of Nobility"  The establishment of... the prohibition of... TITLES OF NOBILITY... are perhaps greater securities to liberty and republicanism than any it [the federal Constitution] contains.

"Nothing need be said to illustrate the importance of the prohibition of titles of nobility. This may truly be denominated the cornerstone of republican government; for so long as they are excluded there can never be serious danger that the government will be any other than that of the people." [danger = nobility government, that of the police state] The Federalist Papers: 484: S&6 -Alexander Hamilton

A title of nobility is privilege of license and license of privilege, otherwise such title of nobility ceases to exist without such privilege of license and license of privilege.  A license to drive is a title of nobility, in that it is a special grant of privilege to use vehicles upon the public highways and roads. So says the Utah Supreme Court cited in *Salina vs. Wisden*, supra.

The State of Oregon (falsely acting as a King) grants "title of nobility" when it takes away a natural existing public or private right, forbidding a natural activity or occupation to all, then turns around and specially grants it back to a few, or many, the special privilege to engage in that activity or occupation and requiring the obtaining of a title of noble privilege (driver's license/license plate) to drive vehicles, and obey attending nobility rules, as applied to the plaintiff by the Courts' Opinion and Order, is Contrary to the US Constitution by the mandate under Article I, Section 10, cl. 1.

"No State shall * * * grant any Title of Nobility." Hence, ORS 811 et. seq., all attendant nobility traffic rules, regulations and penalties, made pursuant to such, is to the Contrary of the (res judicata) mandate of the US Constitution (lest we be corporate slaves in violation of the No Slavery or Involuntary Servitude Clause under the Thirteenth Amendment of the US Constitution) and is notwithstanding and void, by mere operation of law upon this record, as applied to the plaintiff.  Hence, the Court lacks subject matter jurisdiction because of the prohibition of titles of nobility, attendant rules, regulations and penalties, to rule on this case as if it was a routine traffic stop.  Otherwise the Court could be guilty by association of assisting [t]he State and its entities—the University of Oregon and its' Police Department—of committing RICO upon the citizens.

It is the duty of the courts to recognize the substance of Things and not the mere Form. "The courts are not bound by mere form, nor are they to be misled by mere pretenses. They are at liberty – indeed they are under a solemn duty – to look at the substance of things, whenever they enter upon the inquiry whether the legislature has transcended the limits of its authority.  If, therefore, a statute purported to have been enacted to protect...the public safety, has no real or substantial relation to those objects or is

a palpable invasion of Rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution." *Mulger vs. Kansas*, 123 U.S. 623, 661.

Furthermore, "It is the duty of the courts to be watchful for the Constitutional rights of the citizen and against any stealthy encroachments thereon." *Boyd vs. United States*, 116 U.S. 616 (1889). No higher duty of this court exists than to recognize and stop the "stealthy encroachments", which have been made upon the plaintiffs' Right to travel and to use the roads to transport his property in the "ordinary course of life and business." (*Hadfleld*, supra.)

And, the court must recognize that the Right to travel is part of the Liberty of which the plaintiff cannot be deprived without specific cause and without the "due process of law" guaranteed in the Fifth Amendment. (Kent, supra.) The history of this "invasion" of the plaintiffs' Right to use the public highways shows clearly that the legislature simply found a heretofore untapped source of revenue, became greedy and attempted to enforce a statute in an unconstitutional manner upon those free and natural Men and Women who have a Right to travel upon the highways. This was not attempted in an outright action, but in a slow, meticulous, calculated encroachment upon the plaintiffs' Right to travel.

This position must be accepted unless the defendants can show their authority for the position that the "use of the road in the ordinary course of life and business" is a privilege. To rule in any other manner, without clear authority for an adverse ruling, will infringe upon fundamental and basic concepts of constitutional Law. This position, that a Right cannot be regulated under any guise, must be accepted without concern for the monetary loss of the State. See the following case law:

"Disobedience or evasion of a Constitutional Mandate cannot be tolerated, even though such disobedience may, at least temporarily, promote in some respects the best interests of the public." *Slote vs. Examination*, 112 ALR 660.

"Economic necessity cannot justify a disregard of Constitutional guarantee." *Riley vs. Carter*, 79 ALR 1018; 16 Am. Jur. (2nd), Const. Law, Sect. 81.

"Constitutional Rights cannot be denied simply because of hostility to their assertions and exercise; vindication of conceded Constitutional Rights cannot be made dependent upon any theory that it is less expensive to deny them than to afford them." *Watson vs. Memphis*, 375 U.S. 526.

Therefore, the Court's decision in this case must be made without the issue of cost to the state being taken into consideration, as that Issue is irrelevant. The State cannot lose money that it never had a right to demand from the "People." Finally, we come to the issue of "Public-Policy." It could be argued that the "licensing scheme" of all persons is a matter of Public Policy. However, if this argument is used, it too must fail as, "No public policy of a state can be allowed to override the positive guarantees of the Constitution of the United States." 16 Am. Jur. (2nd), Const. Law, Sect. 70.

So, even Public-Policy cannot abrogate the plaintiffs' Right to travel and to use the public highways in the ordinary course of life and business. Therefore, it must be concluded that, "We have repeatedly held that the legislature may regulate the use of the highways for carrying on business for private gain and that such regulation is a valid exercise of the police power." *Northern Pacific R.R. Co*., supra. Moreover, that "The act in question is a valid regulation, and as such is binding upon all who use the highway for the purpose of private gain." Id. Any other construction of this statute would render it unconstitutional as applied to the plaintiff or any person.

Thereby, in accordance with life and liberty under the Freedom of Religion Clause of the First Amendment, the plaintiff has a right to travel, "Since the Constitution guarantees the right of interstate movement…" *Shapiro v. Thompson*, 394 U.S. 629, 634 (1969) ("were exercising a constitutional right, and any classification which penalizes the exercise of that right, unless shown to be necessary to promote a compelling governmental interest, is unconstitutional.") Id. The right to travel is so basic that it need not be mentioned. The State of Oregon arbitrarily and erroneously converted the right into a privilege and issued a license—which is a title of Nobility—and a fee for it. No state may convert a secured right into a privilege and issue a license and a fee for it. See Article I, Section 10, cl. 1 of the U.S. Constitution ("No State shall…grant any Title of Nobility.")

*Murdock v. Pennsylvania*, 319 U.S. 113, 114, (1943) says, ("A State may not impose a charge for the enjoyment of a right granted by the Federal Constitution); and, "The * * * license * * * restrains in advance the Constitutional liberties * * *, and inevitably tends to suppress their exercise." Id.

If a State converts a secured right into a privilege and issues a license and a fee for it, an individual can ignore the license and engage in the right with impunity. "A law subjecting the right * * * to the prior restraint of a license, * * * is unconstitutional, and a person faced with such a law may ignore it and exercise his * * * rights." *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150, 151 (1969).

Conclusively, "The use of the automobile * * * in modern life requires us in the interest of realism to conclude that the RIGHT to use an automobile on the public highways partakes of the nature of a liberty within the meaning of the Constitutional guarantees." *Caneisha Mills, et al v. DC*, No. 08-7127 (D.C. Cir. 2009). And, "It cannot be gainsaid that citizens have a right to drive upon the public streets of the District of Columbia or any other city absent a constitutionally sound reason for limiting their access." Id.

## SUMMARY

Consequently, based upon the case law set forth above and the allegations in the plaintiffs' complaints, that the plaintiff fully incorporates in this pleading, plaintiff was deprived of his constitutional rights as set forth below in the following.

When the plaintiff was stopped and detained from traveling with his automobile for not having a license plate by the defendant – UOPD officer Luke Sitts, the plaintiff was deprived of his constitutional right to travel because he was not operating a vehicle in commerce, and thereby, his Fourth Amendment right to be free of unreasonable search and seizures was violated because officer Sitts has no jurisdiction to detain the plaintiff or regulate his activities while he is engaging in his constitutional right to travel, as he is not making the public ways his place of business.

Plaintiff gave notice to officer Sitts that he was traveling (SAC @ 22), but officer Sitts ignored this fact because of his prejudicial legal conclusion that plaintiff is "driving" pursuant to the States' statute's that license and monopolize the public ways.  Furthermore, the plaintiff did not provide officer Sitts with a license, and thereby, there is no contract between the plaintiff and the State giving the UOPD officers subject-matter jurisdiction or personam-jurisdiction over the plaintiff.

Because the plaintiff was pulled over for no registration plates, and further, did not provide a license (a contract) to officer Sitts, it should be apparent to officer Sitts, that he has no statutory-jurisdiction over the plaintiff's activities upon the public way.  Clue No. (1) ORS 801.415 – "Registration plate" means a plate issued by a jurisdiction as evidence of vehicle registration; and Clue No. (2) ORS 801.245 – "Driver license" is a contract pursuant to ORS 801.255 – "Driving privilege".  Without a license or a registration plate that provides evidence of jurisdiction under the traffic statutes, the UOPD officers – Sitts, Geeting, Brooks, and Barrett, the officers can not claim the plaintiff was engaged in traffic, thereby, committing a traffic violation.

Moreover, after the plaintiff informed the UOPD officers that he was traveling and not engaged in commercial activity that is regulated by the State.  The plaintiff invoked his Fifth and Sixth Amendment rights to remain silent and have council present before responding to any questions.  As the plaintiff has the right to refuse to provide information to the police to further their investigation, as set forth above on page six in *Hale vs. Hinkel*, 201 U.S. 43, 74-75, (1906).  Further, See *Brown v. Texas*, 443 U.S. 47 (1979); and *Moya v. United States*, 761, F2d, 322 (7th Cir. 1958).  Additionally, according to the precedence of *Miranda v. Arizona*, U.S. 384, 436 (1966) ("if the individual indicates, prior to or during questioning, that he wishes to remain silent, the interrogation must cease; if he states that he wants an attorney, the questioning must cease until an attorney is present.").

It is a violation of the Fifth Amendment right to remain silent, when the State compels the plaintiff to be a witness against himself in a criminal case (traffic violations are criminal) by having to carry or present a license pursuant to ORS 807.570, because evidence of a license is involuntary giving the officers statutory-jurisdiction over the plaintiff under color of the Oregon Vehicle Code, and thereby, forces the plaintiff to surrender his right to travel.  Moreover, ORS 807.570 carries criminal penalties for failure to present or a license.  *Chavez v. Martinez,* 538 U.S. 760, 770 (2003) holds that ("a violation of

the constitutional right against self-incrimination under the Fifth Amendment occurs only if one has been compelled to be a witness against himself in a criminal case."  Consequently, pursuant to *Marbury vs Madison*, 5 US 137, 174, 176, (1803), ORS 807.570 is unconstitutional on its face.

Furthermore, ORS 807.570 is unconstitutional because it violates *Title of Nobility Clause* under Article I, Section, cl. 1 and the *Involuntary Servitude Clause* under the Thirteenth Amendment of the US Constitution, because ORS 807.570 forces a person to give up their right to travel to receive a privilege by the grant of a title of nobility – drivers' license.

After additional UOPD officers—officers Scott Getting, Geri Brooks, and Steven Barrett—arrived on scene, they, along with officer Luke Sitts, did not uphold the Fourth, Fifth, Sixth , or Thirteenth Amendments of the US Constitution, and otherwise, that are clearly established laws, because the UOPD officers continued their unwarranted search for a license (SAC @ 31) – that is a contract to gain jurisdiction, by continuing to question the plaintiff when he invoked his right to remain silent, without his council present after he said he wouldn't respond to questioning without council, and, by giving the plaintiff an ultimatum, that he provide a response—by providing a license—or face criminal penalties, and that does equate to involuntary servitude under the Thirteenth Amendment, and further, violates the *Title of Nobility Clause* of Article I, Section 10, cl. 1 of the US Constitution.  See the SAC @ 42 and otherwise.

The UOPD officers, told plaintiff that his automobile will be towed to impound and that he would receive traffic citations (SAC @ 42).  This violates due process of law because (1) the officers have assumed personam-jurisdiction over the plaintiff under color of state law by regulation of a license; and thereby (2) based their legal conclusion that plaintiff is engaged in traffic which gives the officers subject-matter jurisdiction.  See the SAC @ 26.  Thereby, this is a violation of the *Bill of Attainder Clause* under Article I, Section 10, cl of the US Constitution.

See Black's Law Dictionary 2nd Ed. – Bill of Attainder ("A legislative act, directed against a designated person, pronouncing him guilty of an alleged crime, (usually treason,) without trial or conviction according to the recognized rules of procedure, and passing sentence of death and attainder upon him. "Bills of attainder," as they are technically called, are such special acts of the legislature as inflict capital punishments upon persons supposed to be guilty of high offenses, such as treason and felony, without any conviction in the ordinary course of judicial proceedings. If an act inflicts a milder degree of punishment than death, it is called a "bill of pains and penalties," but both are included in the prohibition in the Federal constitution.").

As the plaintiff is presumed by the State by and through its' officers, that he is guilty of a traffic crime, before he ever steps foot into the court, thereby, violating his right to be presumed innocent until he has been proven guilty.  This is why a traffic citation is a bill of pains and penalties, because it

does not hear before it passes judgement.  [A] Bill of Attainder is a device used to deny people the protections guaranteed to them in the Bill of Rights.  Any law, code, ordinance, rule, regulation or statute that suspends or denies a person of their lives, liberty or property is a bill of attainder and is null and void ab initio.

See *Marbury vs Madison*, 5 US 137, 174, 176, (1803) ("All laws which are repugnant to the Constitution are null and void.") and ("Where rights secured by the Constitution are involved, there can be no rule making or legislation which would abrogate them."  *Miranda vs. Arizona*, 384 U.S. 436, 491, (1966). Id.  Thereby, officers—Sitts, Geeting, Brooks, and Barrett are engaging in RICO by depriving the plaintiff of his right to travel under the color of the States' traffic statutes, and fabricating the evidence that the plaintiff was engaged in traffic and guilty of a violation to collect a monetary judgment against him (SAC @ 38 and 42).

Indeed, the UOPD officers ignored the plaintiffs' testimony that he is engaging his right to travel secured under the US Constitution and continued to presume jurisdiction under color of ORS 801.100 – Oregon Vehicle Code.  Moreover, the UOPD officers ignored the plaintiffs' invocation of his rights (1) to remain silent; (2) to have council present before responding to questioning; and (3) and to be free of unwarranted searches and seizures.  This is because the State of Oregon provides law enforcement training that teaches police officers to write Bills of Attainders, and, at many times those police officers fabricate evidence when they write a ticket that a person is guilty of a traffic violation without evidence that the person was engaged in traffic.  This is a clear failure to train on behalf of the State of Oregon.

Moreover, this is a breach of the State's municipal charter under the Oregon Admission Act of 1859 that states in the Preamble: "Whereas the people of Oregon have framed, ratified, and adopted a constitution of State government which is republican in form, and in conformity with the Constitution of the United States, and have applied for admission into the Union on an equal footing with the other States; Therefore—"  This is because the state is enforcing unconstitutional traffic policies through its police officers and courts, that do deprive the plaintiff and many other people of their right to travel pursuant to the US Constitution.

Consequently, the State of Oregon is liable to suit under 42 U.S. Code § 1983, because of this breach of contract (the US Constitution) between the plaintiff ("The People") and the state government.  Additionally, the University of Oregon, and its' Police Department are liable for breach of contract pursuant to their municipal charter that holds: "Any provision of this Constitution which is inconsistent with State Law is void."  Prologue of the Constitution for the University of Oregon.

Congruently, there is no Eleventh Amendment Immunity for the University of Oregon and it's police department, because they are enforcing the State's unconstitutional traffic statutes by and through the police officers of the University's Police Department.  Thereby, the plaintiff feels the Court

erred in its' First Opinion and (Order at 22) by dismissing the University and its Police Department as defendants from the matter, based upon the Courts assertation of their Eleventh Amendment immunity that doesn't exist when they are in breach of contract – their municipal charters – by not adhering to the laws of the land under the US Constitution.

Furthermore, the State's failure to train its' law enforcement officers to uphold the US Constitution, by upholding a the common-person's constitutional right to travel, has led to assault and battery of the plaintiff (see the SAC @ 48-55) by the UOPD officers – Luke Sitts, Scott Geeting, Geri Brooks, and Steven Barrett.  This is because the officers are in violation of their 10th Amendment police powers by enforcing ORS 807.570 that conflicts with the plaintiffs' the Right to Travel under [t]he Constitution, and ORS 807.570 is an abuse of the States' legislation power.

[T]he Constitution is a contract designed to limit government.  Police officers enforcing legislated policies of the state have no authority to deprive a citizen of rights secured by the Constitution. See Black's Law Dictionary 10th Ed. @ 1345 ("Police power is a states Tenth Amendment right, subject to due-process and constitutional limitations, to establish and enforce laws protecting the public's health, safety, and general welfare.").

Furthermore, even though the _unconstitutional precedence_ of Terry v. Ohio, 392 U.S. 1, 30 (1968) _that makes an exception to_ the Fourth Amendment's _warrant requirement_ in relation to a traffic stop (See _Marbury vs Madison_, 5 US 137, 174, 176, (1803) ("All laws which are repugnant to the Constitution are null and void.")), _does not apply in this particular case, because_ it has been established that _plaintiff was_ not engaged in traffic while _exercising his constitutional right to travel, and thereby, is not subject to_ the States' statutory jurisdiction under color of _a traffic stop_.

Because the detainment of the plaintiff is based upon prejudicial legal conclusions of a traffic stop by the UOPD officers, and those conclusions are a fabrication of the evidence without merit, as it has been firmly established the plaintiff was not a driver operating in traffic, but merely a traveler traveling in his automobile to fulfill his life's obligations, the plaintiff clearly was unlawfully arrested, because it was done under color of law – ORS 807.570.

Moreover, the plaintiff had identified himself, thereby, there was no cause to detain him any further, as outlined in the traffic code of ORS 807.570(4): A police officer may detain a person arrested or cited for the offense described in this section only for such time as reasonably necessary to investigate and verify the person's identity.  Nor was there any reason to detain him at all because he wasn't a driver in participating in traffic.

Additionally, when the plaintiff asked Officer Sitts (at the hospital) if he was under arrest when they told him to exit his car so they could tow it from the public ways, and then issue him traffic citations.  Officer Sitts told the plaintiff "No you were not under arrest at that time."  Which means the

plaintiff was placed under arrest after he resisted the assault and battery by the officers, and further, means the UOPD officers fabricated evidence that the plaintiff resisted arrest (SAC @ 61).

As the plaintiff had broken no law and committed no crime, and thereby was not under arrest. Because the plaintiff cannot be legally arrested for exercising the right to travel. "The claim and exercise of a constitutional Right cannot be converted into a crime." *Miller vs. United States*, 230 V. 486,489, (1956); and *Sherar vs. Cullen*, 481 F. 2d 946, (1973) ("There can be no sanction or penalty imposed upon one because of this exercise of constitutional Rights."). Thereby, this is further evidence the plaintiff was falsely arrested by the UOPD officers.

And, even if the officers had intended to arrest the plaintiff for their fabricated traffic crimes under ORS 807.570, the officers should have told the plaintiff he was under arrest and read him his rights pursuant to the clearly established precedence of Miranda v. Arizona, 384 US 436 (1966), but they didn't (SAC at 57), and this negligence by the officers lead to assault of the plaintiff when he resisted the officers unexpected battery. Additionally, the plaintiff was falsely imprisoned with injuries, because of the excessive force used in the assault and battery of the plaintiff by the UOPD officers, as they alleged false claims that he was resisting arrest.

Also, the UOPD officers where under the direct command of UOPD Captain Don Morris, and he did not prevent the officers' deprivation of the plaintiff's constitutional rights, as set scribed above and below. See the SAC at 59. Moreover, the plaintiff attempted to settle the matter with the U of O by contacting its President – Michael H. Schill, and with the UOPD by contacting its Chief – Mathew Carmichael, but was meet by their tacit agreement for the plaintiffs claims of a deprivation of rights by not proving their jurisdiction to detain, assault, arrest, and imprison the plaintiff, by the silence from the University and its' Police department by the head representatives of their departments, and the officers therein (SAC at 75-99).

Furthermore, the professional standards unit for the UOPD didn't follow their protocol to contact the plaintiff to let him know his complaint was documented and being reviewed. Thereby, the defendants – Morris, Carmichael, and Schill are directly depriving the plaintiff of due process of law under the Fifth and Fourteenth Amendment, as well as equal protection of the law under the Fourteenth Amendment of the US Constitution, by their obstruction of justice because they remained silent in regards to the plaintiffs' complaint filed with their police department. Thereby the defendants' – University of Oregon and UOPD remained silent and deprived the plaintiff of due process and equal protection of the laws.

In sum, based upon the argument of the facts and laws as applied above, the UOPD officers – Sitts, Geeting, Brooks, and Barrett – violated the *Privileges and Immunities Clause* of Article IV, Section 2, *Unalienable Rights Clause* of the Ninth Amendment, and the *Due Process* and *Equal*

*Protection of Law Clauses* of the Fourteenth Amendment of the US Constitution. This is because the UOPD officers violated the rights of the plaintiff under Article I, Section 10, cl.1, and the Fourth, Fifth, Sixth, Tenth, and Thirteenth Amendments of the US Constitution during the unlawful detainment of the plaintiff, as set forth above, and throughout the plaintiff's complaints in the instant case.

Consequently, the Court's Opinion and Order that concludes that the plaintiff has no inherent right to travel with his automobile under the common law of the United States of America is in error. This is because the Court has formed a prejudicial conclusion by its' interpretation of the plaintiffs' complaints based upon the State of Oregon's monopoly of the public ways within the state, by regulation of a license to the use the public ways under ORS 801.245. Thereby, the Court did error by dismissing the deprivation of constitutional rights claims under 42 USC § 1983 for unlawful arrest of the plaintiff and fabrication of the evidence, because of the Courts' opinion was prejudicial that the plaintiff was involved in a traffic stop.

Therefore, while applying irrelevant case law to the matters in this case, the Court did error by dismissing plaintiff's claims for a deprivation of his constitutional rights – (1) pursuant to the *Bill of Attainder* and *Title of Nobility Clauses* under Article I, Section 10, cl. 1; (2) pursuant to the *Privileges and Immunities Clause* of under Article IV, Section 2; (3) pursuant to the *Unlawful Search and Seizure Clause* of the Fourth Amendment; (4) pursuant to *Right to Due Process* and *Right to Remain Silent Clauses* under the Fifth Amendment; (5) pursuant to the *Right to Council Clause* under the Sixth Amendment; (6) pursuant to the *Unalienable Rights Clause* under the Ninth Amendment; (7) pursuant to the *Police Power Clause* of the Tenth Amendment; (8) pursuant to the *Involuntary Servitude Clause* of the Thirteenth Amendment; and (9) pursuant to the *Due Process* and *Equal Protection Clauses* of the Fourteenth Amendment – against the defendants – Luke Sitts, Scott Geeting, Geri Brooks, Steven Barrett, Don Morris, and Matthew Carmichael, Michal H. Schill, the University of Oregon, and the U of O Police Department. Given the complaints where hard to read, the plaintiff understands how the Court could error with its' Opinion and Order.

C.    **Three Strike Rule**

There is a three- strike rule that runs deep in our Nations' history from our Nation's first organized sport of baseball to our law, as Twenty-eight states have some form of a "three-strikes" law. Thereby, plaintiff should be allowed to fix his errors with his complaint.

**CONCLUSION**

For the reasons set forth above, the plaintiff, respectfully, moves the Court for an order granting a third-leave to amend his complaints for excessive force and a deprivation of constitutional rights.

THE PLAINTIFF.
DATED this 19th day of October, 2020.

_s/James-Brent: Alvarez UCC 1-308_
James-Brent: Alvarez
c/o 30924 Kenady Lane
Cottage Grove, Oregon [97424]

<u>CERTIFICATE OF SERVICE</u>

        I hereby certify that on October 19, 2020, I served the foregoing Plaintiffs' Objections to the Courts' Opinion and Order's and Motion for Reconsideration for Leave to Amend the Complaint a third time on:

        Namoi Levelle Haslitt, OSB No. 075857
        naoml.haslitt@millernash.com
        Iván Resendiz Gutierrez, OSB No. 154617
        ivan.resendiz@millernash.com
        MILLER NASH GRAHAM & DUNN LLP
        3400 U.S. Bancorp Tower
        111 S.W. Fifth Tower
        Portland, Oregon 97204
        Telephone: 503.224.5858
        Fax: 503.224.0155

        Attorneys for Defendants
        Luke Sitts, et al.

by the following indicated method of service set forth below:

        Email: as agreed on by all parties involved during the Covid-19 situation, until either party terminates the agreement.

        <u>*s/James-Brent: Alvarez UCC 1-308*</u>
        James-Brent: Alvarez
        c/o 30924 Kenady Lane
        Cottage Grove, Oregon [97424]